ROGERS VS. VAUGHAN, adm'r.

1. MORTGAGE: *Bill of Sale construed to be.*
    An absolute bill of sale, executed to secure a debt, operates as a mortgage, and will be postponed to a subsequent, and recorded, mortgage.
2. TRUST: *When advances by cestui que trust repaid out of trust fund.*
    When one of several beneficiaries of a trust fund at the request of the trustee, advances means necessary to preserve the trust fund, he is entitled to re-imbursement out of the fund for such advances.
3.———:
    A land owner who had let his land to laborers for one-half the crop, mortgaged his share to secure debts due various parties, and among others to secure future advances and a debt due to A. The laborers afterward gave to the land owner a lien on their shares to secure future supplies and other debts due him, he transferred this lien to A, who at the time took a mortgage from the laborers to secure the supplies; held, that A. did not take the lien, and latter mortgage, as collateral to the original security, but as independent security for the supplies to be furnished the laborers, and the other creditors were not entitled to have it brought into the trust fund.

APPEAL from *Jefferson* Circuit Court in Chancery.
Hon. READ FLETCHER, Circuit Judge.
*Met. L. Jones,* for appellant.

S. W. WILLIAMS, SP. J.:

On the 5th day of April, 1871, one F. A. Turner, who was engaged in planting in Jefferson County, Arkansas, desiring to get supplies to enable him to make his crop, and being also indebted to appellee Fitzpatrick, and appellant Rogers, and one Murphy, at the time, to secure the appellant in supplies as well as to secure the debts then due from him, executed a deed of trust, whereby he conveyed to William F. Owen as trustee of the second part, and describes appellant as of the third part, all the crop of cotton and corn "grown or raised" for the year 1871, on his own place, in Jefferson County, and about one hundred acres of the Withers place which he had rented, being about 215 acres in all, also certain mules, wagons, oxen, and a Pratt gin

stand, which were conveyed in trust to secure advances to be made by the party of the third part, not to exceed twelve hundred dollars, to enable him to cultivate and raise the crop, and secure Rogers, Fitzpatrick and Murphy in certain debts they then held. On default in payment, the trustee was to take possession of the property, gather the crop, ship the cotton, and sell it in New Orleans, and if necessary, to sell the property on notice, at public sale, first exhausting the crop, and out of the proceeds to pay Rogers for his advances and then the other debts named; but if there should not be enough to pay all, after the advances were paid, then the trustee was to pay the other debts *pro rata* according to amount.

This deed of trust was signed by Turner, and acknowledged on 5th of April, 1871, and filed for record on the 14th day of April, 1871.

Turner rented his land, in part at one-fourth of the cotton to be delivered to him, and in part for a specific number of pounds (90) of ginned cotton per acre. But by far the greater portion of his land was worked on the share crop plan. Turner receiving one-half for his land, use of stock and implements and feed for plow animals, and the laborer to receive the other half for his labor.

The crop was planted and cultivated, and matured; Turner drawing his supplies from Rogers, and furnishing it to the hands until he had exceeded the limits of $1,200, provided for in the deed of trust. On the 19th of August, very near or quite the beginning of cotton harvest, Turner being in very bad health desired to leave the State, and go to Tennessee, and it being necessary that further supplies should be advanced to the laborers, an arrangement was effected whereby Turner had all his laborers, except Jesse Nicholson, to execute to him a contract in this form:

"This agreement made and entered into this 19th day of August, 1871, by and between F. A. Turner party of the first part, and Rufus Davis, George Washington, Henry McFarland, and William Murphy, parties of the second part, witnesseth that whereas the said parties of the second part have contracted with the said party of the first part, to cultivate forty-five acres of land, more or less, in cotton, on the place known as the Dr. Sam. Withers place and the Turner place, in Jefferson County, Arkansas, in the year 1871.

And whereas, the said parties of the second part, are to receive for their services in cultivating and gathering said crop, one-half of the same, to be apportioned among the said second parties as follows, to-wit: The said Rufus Davis to receive one and one-half shares (1½), said Washington one (1) share, and Murphy one (1) share.

And whereas, the said second parties are at this time indebted to the said first party in the following sums respectively, to-wit: Rufus Davis in the sum of $80.72, George Washington in the sum of $94.04, Henry McFarland in the sum of $219.67, William Murphy in the sum of $73.72. Now it is agreed and understood between the parties hereto, that the said first party shall have a special lien upon all the interest of each of the said parties severally of the second part in the said crop raised on said land during the said year, 1871, to secure the payment of the indebtedness to the said first party as aforesaid, and also a special lien on the same for any indebtedness contracted by the said second parties hereafter for supplies, etc., for the said year 1871, to be used or consumed in gathering said crop. And it is further understood and agreed that said second parties shall in no event employ laborers to work in said crop without the full knowledge and consent of the said first party."

On the same day, and as a part of the same transaction, Turner executed the following transfer :.

For value received, I transfer all of my right, title and interest in the within, to A. A. C. Rogers & Co., and guarantee the payment thereto.          (Signed)          F. A. TURNER.

This was acknowledged, but not recorded. The laborers executed on the contract the following agreement:

We agree to and are firmly bound by the above transfer, to A. A. C. Rogers & Co. by F. A. Turner. All the laborers, except Nicholson, executed similar contracts as to their interests, which were in like manner transferred, acknowledged, and agreement endorsed as this was. On the same day, and as the proof tends to show, as a part of the same transaction, these laborers mortgaged their share of the crops to Rogers, to secure for future supplies to be advanced, which mortgages were acknowledged and filed for record August 22d, 1871.

Jesse Nicholson near the beginning of the season, on 23d May, 1871, mortgaged his share of the crop, being three-fourths of the portion cultivated by him, to Rogers, and drew his supplies direct from him all the season.

The proof tends to show that on the 19th day of August, 1871, when Turner and Rogers and the laborers made the contract above referred to, that it would have been impossible to have gathered the crops and saved the trust funds, unless Rogers, or some one else, advanced supplies and funds to meet expenses. It is also in proof that Rogers did furnish the laborers supplies, an account of which is set out, and exhibited with his answer; it is also proved that most of the debts due Turner on 19th August, 1871, were for supplies furnished in 1870, and prior to April 5th, 1871.

Rogers states in his answer and deposition, that the contracts made with Turner by his laborers, which was assigned to him before, or at the time the mortgages were executed by the laborers to Rogers, was designed and intended to get Turner's debt

and liens out of the way, so that his advances might have priority, and all the circumstances of the case, and the conduct of parties strongly corroborate this version of the matter.

The trustee, after harvesting had progressed to some extent under the direction of Rogers, on complaint of Fitzpatrick, took charge of the crops, and employed one Watkins to attend to gathering them, and Rogers furnished him funds from time to time for the purpose, and the trustee, after much difficulty, made what he was led to suppose to be a compromise distribution of the funds, in which he took the amount of Turner's share of the crop, added to it $607, the proceeds of the sale of the stock, and added to that one-half of the laborers' shares, making this the trust fund, and divided it after deducting rent and taxes paid by him, and other expenses necessarily incident to the execution of the trust; he divided the trust fund, so formed, as the deed of trust directs substantially.

Murphy received his part without complaint. Rogers claimed that he was entitled to all the laborers' shares, instead of only half which the trustees allowed him, but accepted his part under protest. Fitzpatrick accepted his, claiming at the time that all the laborers' shares, instead of half, should have been carried into the trust fund, but declined at the suggestion of the trustee to file a bill in chancery, and, by his conduct, led the trustee to believe that while he protested, he acquiesced and was satisfied, and promised to give an absolute receipt. But afterwards refused to give anything but a receipt for so much received on account.

The testimony shows that all the way through, the trustee acted with the utmost good faith, and the funds being insufficient to pay all, and the parties being unfriendly with each other, made his duties delicate, and difficult, although facilitated by the friendship to himself of all parties, which enabled him to effect what he supposed was a final compromise.

After receiving the portion of the funds thus awarded him, Fitzpatrick filed his bill against Rogers, who was the sole owner of the assets of A. A. C. Rogers & Co., Murphy, and Owen, the trustee, and Turner, for an account of the trust funds, in which he sets out substantially the whole matter as above detailed; and exhibits the deed of trust, the contract between the laborers and Turner, the transfer of the same to Rogers, the mortgages to Rogers, and claims that this transfer to Rogers of Turner's contracts was as collateral security to the deed of trust, and therefore that the shares of the laborers in the crops should have all been taken and distributed as a part of the trust fund. That their shares amounted to $1,844.11, and the interest of Turner in these shares, by reason of the contract with him, was $1,562.61 (Owens' answer, and the proof shows that it was $1,434.81) and claimed that the expense of executing the trust was too great. That the proper expenses, taxes, etc., made $900 to be deducted from the trust fund. That Rogers had received the aggregate amount of the several debts of the laborers with Turner under the transferred contracts which amount, by agreement between Turner and Rogers, was to go into the trust fund.

Rogers answered, denying that the transfer of Turner's contracts to him, was intended as collateral security to the deed of trust, and claiming as above stated, that it was done to enable him to supply hands, and that nothing was said about what disposition was to be made of the surplus of the hands' shares after paying for their supplies, except that it was to stand to Turner's credit, and on the faith of it, Turner got some further advances.

Turner answers also, and denies that the transfers were designed as collateral security to the deed of trust, and notwithstanding there is some apparent formal conflict between Turner's answer and his deposition, yet he states distinctly that the amount due him from the laborers, which he transferred to Rogers, was to stand to his general credit, and he expected until

late in the fall, that he would realize enough from that source to start him another year, and then he feared that other creditors might attach it, and he directed the trustee to appropriate this, and use it as a part of the trust fund.

This was long after the date of Roger's mortgages, and after most of his advances were made, on the faith of the transfers and mortgages, to the laborers to enable them to gather the crops.

Rogers, also, claimed an allowance out of the trust fund for $150, paid to one Reeder, who held an unrecorded bill of sale, as security for money, on two of the mules conveyed by the deed of trust.

Reeder testified, that he never had possession of the mules, but they remained with Turner and his bill of sale was to secure a debt due him.

The case was brought regularly to issue, and by consent of parties, and at their request, F. J. Cameron was appointed to take the accounts, etc.

The master filed his report with all the depositions taken by him.

*First*—He disallowed to Rogers the amount paid to Reeder.

*Second*—He allowed Rogers three-fourths of Nicholson cotton under Nicholson's mortgage.

*Third*—He decided that the shares of the laborer's crops were transferred to Turner, and by Turner assigned to Rogers, as collateral security to the deed of trust, and to the extent of the indebtedness of the laborers to Turner, up to August 19th $1,434.81, the proceeds should go to the trust funds, in postponement of Roger's mortgage from the laborers for supplies advanced to them.

Rogers excepted to this report.

*First*—Because it disallowed the amount paid by him to Reeder on his mortgage on the mules.

*Second*—Because the shares of the laborers were put into the trust fund, whereas it ought to have been given to him under the transfer of Turner and the mortgages.

Owen excepted also ; but as the court discharged him, we will not notice the exception.

The court overruled the exceptions, and confirmed the report, and rendered a decree "barring and foreclosing" Murphy's interest in the fund to the benefit of Rogers and Fitzpatrick, on the ground that Murphy had not demurred—a novel disposition of the interest of a party litigant, who, upon the basis upon which the court decreed, had an undisputed interest.

The court decreed that the sum of $1,080.43, instead of $663.11, distributed by the master, was the proper amount of the trust funds, and Murphy was decreed to be "barred and foreclosed" of his undisputed interest, and decreed that Fitzpatrick recover of Rogers $303.70, balance due at his *pro rata* share of trust funds, which had been received by Rogers out of the laborers' share.   Rogers appealed to this court.

The questions here are raised on Rogers' exception to the Master's report.

*First*—Was Rogers entitled to credit and payment out of the funds for the amount of $150, paid Reeder on account of his mortgage, on the two mules?

We think not, the bill of sale to Reeder not being accompanied with possession, and being extended by the parties as a mere security for a debt, was a mortgage.   It is the fact that there is a defeasance, and not the evidence of the fact, which makes an instrument a mortgage.   Therefore, whether the evidence of the defeasance is in parol or in writing it is a mortgage, if the fact of a defeasance exists.   It is too well settled under our laws, that an unrecorded mortgage must be postponed to one upon record,

to now need authority or comment. It follows that this mortgage not being a charge upon the trust property, Rogers had no right to charge the trust fund with its payment.

*Second*—Was Rogers entitled to the proceeds of the laborers' share ?

It is pretty clearly established that Turner left for Tennessee, after making the transfer of his laborers' contract to Rogers, which gave him the absolute control of his liens, and was gone there some weeks, and that Rogers, or some one, had to supply the laborers, or they could not have gathered their crop without sustenance, and that Rogers did advance them supplies, including bagging and ties, and expenses of ginning and marketing their crop; all of these expenses the court below postponed in favor of the debts of Turner, previous to August 19th, 1871, and held the amount as part of the trust fund, limiting Rogers by a very doubtful construction of the trust deed to $1,200, the amount limited thus, as between himself and Turner, Murphy and Fitzpatrick being no parties, but mere beneficiaries in the deed, and that, although Rogers had advanced, as Fall, his book keeper, testifies nearly $1,400 to Turner on his crop.

It is evident that, but for this furnishing of supplies to laborers, the whole trust fund would have been lost.

If Owen, the trustee, had found it necessary to advance it, and in good faith had done so, he would have been entitled to charge it to the trust fund, as expenses.

Owen swears he called on Rogers for some advances ; surely the beneficiary in a deed of trust has a right to make advances to save a trust fund ; it is his right, if not his duty, to do so, and on this principle alone, Rogers was entitle to his advances made to the laborers for supplies after the 19th of August, which were necessary to save and gather the crop, and as between himself and his co-beneficiaries, he had an equitable right to be

re-imbursed out of the fund for all needful outlays expended to save the trust fund.

The deed of trust of April 5th, applied to and covered only the crop which Turner might raise or grow on the places named, or which might be raised or grown for him, in shape of rents in kind, or shares. It did not apply to any crop which he might thereafter purchase, nor did that deed prevent Turner from purchasing cotton, corn, or growing crops, or taking mortgages on them, and transferring the same free from any claim under the deed of trust.

The contrary of this is not pretended or claimed; all that is claimed is in general terms, that the transfer of Turner's lien, if his loan contract gave him any, was as collateral security to the deed of trust. As a proposition of law, it is untenable, for Rogers by the transfer had the absolute right to postpone it to his mortgages, or cancel the Turner claim absolutely.

He did postpone it to his supply mortgages by having them recorded, and acting under them in making advances.

Besides, if the Turner contracts were transferred to Rogers as collateral, he at least would stand in Turner's shoes as to future supplies which were secured to Turner, and as no priority was given to these liens, they at least stood equal, and even upon plaintiff's grounds the laborors' crops should be divided between future supplies, and debts existing at the 19th of August 1871, equally, which is about the basis upon which the trustee settled, which was eminently fair to Fitzpatrick.

The claim of Fitzpatrick, that the transfer of the Turner contract was a collateral security, etc., as a proposition of fact, is not sustained by the weight of the evidence or by circumstances of the case, or conduct of parties, at the time of the transaction and subsequently, all, in the main, contradict it.

Turner's directions to the trustee, several months after Rogers had taken his mortgages and had them recorded, having ownership of and right to control Turner's debt and cancel the lien, if he chose, and having advanced supplies to the laborers, could not affect Roger's right, if he had any before.

The proof satisfactorily establishes that if there was any secret trusts existing at the time of the transfer, or any understanding, except that Rogers was to be secured in advances to the laborers, beyond the legal conveyances attaching to the transaction on its face, it was undeclared.

The legal conveyance, in the absence of any special declared trusts, aside from its surroundings, would have given Rogers the right to have appropriated what might be coming to him on the Turner transfers, to any debt Turner might owe him. But as he owed none but the debt secured by the deed of trust on that day, good faith required of Rogers to appropriate it there, which would have lessened his debt, and *pro rata* distribution under the deed of trust, and correspondingly increased the *pro rata* portion of his co-beneficiaries.

We are satisfied from Rogers' statement in his testimony, and other evidence and circumstances corroborating and sustaining his answer, that the allegations of the complaint are not sustained as to this, and that the whole object was to clear the way for the laborers' supply mortgages, while nothing was said, or perhaps thought, of the ultimate disposition of what might be coming on the Turner transferred contracts.

But for the fact, that Turner directed that it should be placed to the trust fund, and Rogers acquiesced in this direction, tacitly, if not expressly, we would leave him to appropriate it on his own debt existing April 5th, 1871; as it is, we shall direct, after Rogers' supplies and advances to the laborers are paid, that the balance, if any, be placed with the trust fund, as Turner directed. But as Rogers was the owner of this claim on the 19th of August,

and had then a right of appropriation, and as there is an excess of near $200 of supplies advanced on the crop to Turner, over the limits preferred in the deed of trust of April 5th, we hold that no principle of good faith or equity required Rogers to lose this, and as it stands unsecured, and must be lost, and was used in making the crop, we will direct that this sum be allowed Rogers out of the laborers' fund.

This contest has grown out of the misfortunes of a short crop and low prices, so frequent and disastrous to cotton interest in this country.

The court erred in overruling Rogers' second exception to the Master's report on this point; and in confirming the same, and decreeing accordingly.

Murphy has not appealed, but if this court should find on a re-statement of accounts here, that anything was due him, it could not be decreed to another, so the court below erred when it decreed to Fitzpatrick funds, for which, if liable at all, Rogers was liable to Murphy.

For these errors, the judgment of the court below is reversed, except so far as it discharges Owen, the trustee, from liability as to which it is affirmed, and it is referred to the Clerk and Master of this court to reform and restate the accounts from the proofs on file and statements in the transcript.

He will find the amount of the proceeds of the crops, ascertain the interest of the laborers therein, which is admitted in all the pleadings and statements to be $1,844.11. From this deduct the proceeds of Jesse Nicholson's crop, if it be included in the gross estimate, which crop of Nicholson the Master will divide as the Master below did.

He will then ascertain Turners portion of the crops, and add to it $610, the proceeds of the sale of the stock; out of the first, or laborers' fund, he will deduct all sums due Rogers from the

laborers for supplies furnished after 19th of August, 1871, including their share of advances of expenses for gathering crop, if any. To which he will add amount of supplies advanced to Turner, prior to August 19th, 1871, which is in excess of the .$1.200, preferred debt, secured by deed of trust of April 5th.

If anything is left on this laborers' fund after allowing Rogers' expenses, the Master must add it to the trust fund, which he will divide in accordance with the provisions of the deed of April 5th, giving Rogers $1,200, preferred debt for supplies to Turner, and the balance *pro rata*, after deducting expenses of the trust, taxes and rents paid, etc., and ascertain and report how much, if anything, has been received by either of the beneficiaries in the deed of trust, in excess of the amount due him, and equalize their interests by finding how much, if anything, the one may owe the other, on account of such excess received.